No. 26,619.

THE FIRST NATIONAL BANK OF LARNED, *Appellee*, v. THE FARMERS STATE BANK OF LARNED, and WILLIAM DOCKING, as Substituted Receiver, etc., *Appellants*.

No. 26,620.

THE FIRST STATE BANK OF LARNED, *Appellee*, v. THE FARMERS STATE BANK OF LARNED, and WILLIAM DOCKING, as Substituted Receiver, etc., *Appellants*.

SYLLABUS BY THE COURT.

1. BANKS AND BANKING — *Insolvency — Preferred Claims — Holder of Draft.* Where the representatives of two plaintiff banks and a defendant bank which were engaged in banking business in the same city were accustomed to meet daily at the close of business hours for the purpose of clearing checks which they had paid for each other in the course of the day's business, and where the balance thus found to be due from one to another was settled by issuing a draft drawn by the debtor bank on its metropolitan correspondent in favor of the creditor bank, and where pursuant to such daily course of business the defendant bank issued in favor of the two plaintiffs its drafts drawn on its metropolitan correspondent but which were not paid because the defendant bank was closed for insolvency, the plaintiff banks were not entitled to preferred claims against the assets of the defendant bank.

2. SAME—*Preferred Claims—Drafts Issued Without Knowledge of Insolvency.* Where the officers and employees of the defendant bank who effected the daily clearance of checks and settlement of accounts with plaintiff banks and issued the customary drafts for the balances due from it to plaintiffs did not know that defendant was insolvent, the fact that the bank was actually insolvent and passed into the hands of a receiver and that the drafts were dishonored by the drawee did not give rise to preferred claims in favor of the plaintiffs against the assets of the defendant bank.

3. SAME—*Preferred Claims—Effect of Absent President's Knowledge of Insolvency.* Assuming that the president of the defendant bank did know of its insolvency at and prior to the time the drafts were issued to plaintiffs pursuant to the last daily clearance and settlement (notwithstanding the trial court's finding to the contrary), the absence of the president from the city on urgent bank business and his consequent want of notice or knowledge of any particulars of the clearance and settlement until after the transaction was completed and the drafts issued preclude consideration of intentional fraud in issuing the drafts as a basis for preferred claims on behalf of plaintiffs against the assets of the insolvent bank.

. Assignments, 5 C. J. p. 916 n. 44. Banks and Banking, 7 C. J. pp. 593 n. 76, 751 n. 75, 752 n. 88. Bills and Notes, 8 C. J. pp. 33 n. 16, 36 n. 67, 40 n. 21, 64 n. 16.

Appeals from Pawnee district court; Roscoe H. Wilson, judge. Opinion filed April 10, 1926. Case No. 26,619 reversed. Case No. 26,620 on appeal reversed; on cross appeal affirmed.

*W. H. Vernon, Jr.,* and *J. S. Vernon,* both of Larned, for the appellants.

*George W. Finney* and *Roscoe E. Peterson,* both of Larned, for the appellees.

The opinion of the court was delivered by

Dawson, J.: These were actions by two banks of Larned to have preferences declared in their favor against the assets of an insolvent bank in the same town.

On and for some time prior to September 14, 1922, the First National Bank of Larned, plaintiff in case No. 26,619, and the First State Bank of Larned, plaintiff in case No. 26,620, and the Farmers State Bank of Larned, defendant herein, were engaged in the general business of banking in the city of Larned. It was the daily custom of these banks to have certain of their officials or employees meet and settle whatever claims might be due between them on account of checks drawn by depositors of any one of them and which had been honored and paid by either of the others. The balances due after thus clearing each other's checks were settled by the debtor bank issuing a draft drawn on its correspondent bank in Kansas City in favor of the creditor bank as shown by that particular day's business.

On the afternoon of September 13, 1922, pursuant to this daily method of settling accounts between these banks, their representatives met and had an accounting and clearance of commercial paper which they had honored and paid for each other during that day, and on a balance being struck it was found the Farmers State Bank was indebted to the First State Bank in the sum of $453.87, for which amount the debtor bank issued to the creditor bank its draft drawn on the Commerce Trust Company, metropolitan correspondent of the defendant bank at Kansas City, Mo.

On the afternoon of the following day, September 14, 1922, the representatives of these banks came together for their usual purpose, and on striking a balance it was found the Farmers State Bank owed the First State Bank the sum of $2,389.86, for which amount the debtor bank issued to the creditor bank its draft on its metropolitan correspondent.

At the same time there was a similar settlement of the respective

claims and offsets of the defendant bank with the First National Bank of Larned. It was found that the First National Bank had that day paid $5,071.40 on checks drawn on the Farmers State Bank in excess of the aggregate sum which the Farmers State Bank had paid on checks drawn on the First National Bank. In addition to the balance of $5,071.40 thus found to be due the First National Bank, the latter bank had an additional claim against the Farmers State Bank for $800 for money which it had advanced that morning to facilitate defendant's currency transactions. In settlement of both claims, *i. e.*, the clearing-house balance due, $5,071.40, and the $800 loan, the debtor bank issued to the First National Bank a draft for $5,871.40 drawn on its Kansas City correspondent in the usual manner.

On these two dates, September 13 and 14, the Farmers State Bank was actually insolvent. On September 14, the president of the defendant bank had been in Great Bend endeavoring without success to raise funds by selling lands belonging to the bank. When he returned to Larned that evening and learned the amount of the drafts which the bank had been required to issue to effect its daily clearance and settlement with its competitors, he called a representative of the state banking department to come to Larned for consultation, and on the latter's advice the bank commissioner took charge of the bank on the morning of September 15. Neither of the plaintiff banks knew that the defendant bank was in serious financial difficulties. On learning of its plight on the morning of September 15, President Moffett of the First National Bank offered to loan $50,000 to maintain it as a going concern, but the president of the defendant bank said it did not have remaining a sufficient amount of good collateral to secure such a sum of money. The bank did not reopen on September 15, but remained closed for insolvency. The drafts issued to the plaintiffs in the clearing-house settlements on September 13 and 14 were not paid; and plaintiffs brought these actions to have their claims based on these drafts adjudicated to be entitled to preference in the apportionment of the assets of the insolvent institution.

The cause was tried partly on an agreed statement of facts and otherwise upon evidence adduced by the litigants. The trial court made findings of fact and held that plaintiffs were entitled to a preference on their claims based upon the drafts issued on September 14, but that the First State Bank was only entitled to a common claim, not to a preference, for the amount of the draft issued pursuant to the settlement on September 13.

From the judgments allowing preferences based on the settlements and drafts of September 14, the defendant bank and its receiver appeal. From the denial of a preference on its claim based on the settlement and draft of September 13, the First State Bank appeals.

What was there about either of these demands of plaintiffs which was out of the usual and which might serve as a basis for a preferred claim against the assets of the insolvent bank? Surely it cannot be that plaintiffs attach some peculiar significance to the fact that their claims against the assets were evidenced by drafts rather than by checks or other instruments directing the payment of money? In *State Bank v. State Bank,* 114 Kan. 463, 467, 218 Pac. 1000, it was said:

"A draft drawn by a bank upon another bank has the same status in law as a check drawn upon a bank by an individual. (McGee on Banks and Banking, 3d ed., p. 306; Michie on Banks and Banking, p. 1611.)"

An alternating relationship of debtor and creditor existed between these litigants from day to day, and when the daily settlements were made the fact that drafts were given for whatever balances were due from one to the other created no such unusual relationship between them as that of trustee and *cestui que trust,* nor did the particular sum or sums due and payable from either one to the other or others constitute a trust *res* or trust fund which the defendant bank had possession of and which passed as assets into the hands of the receiver when the Farmers State Bank was closed for insolvency. The relationship of debtor and creditor existed between the plaintiff banks and the defendant bank when they had effected their daily clearance of each other's checks (3 R. C. L. 651-655), and that relationship was not altered by the acceptance of drafts on defendants' Kansas City correspondent, unless and until those drafts were honored and paid by the drawee. A check or draft is sometimes spoken of as an assignment of a fund or right which the drawee holds for the drawer, but critical thinkers have discerned difficulties in attributing that technical character to these instruments (*Clark v. Bank,* 72 Kan. 1, and citations, 82 Pac. 582); and under the negotiable instruments act a draft does not operate as an assignment of money in the hands of the drawee although the latter may hold funds subject to the order of the drawer and available for its payment. (R. S. 52-1002; 3 R. C. L. 1298; 8 C. J. 33, 36, 40, 64.) In 5 C. J. 916 it is said:

"By the great weight of authority, in both the United States and England,

an order or ordinary bill of exchange or draft payable generally, not drawn on a particular fund, and not accepted, does not constitute a valid equitable assignment."

It sometimes happens that through misrepresentation or fraud of a bank officer, and while his bank is about to close its doors for insolvency, a person is induced to take a draft in lieu of cash, and a trust *ex maleficio* may thereby arise which will entitle the defrauded party to a preferred claim against the assets of the wrongdoer, (*Sherwood v. Savings Bank,* 103 Mich. 109, syl. ¶ 2) and sometimes a trust and resulting right to a preference may arise where the relation of the claimant to the bank was purely that of principal and agent, and the action of the bank commissioner in taking charge of the bank alone prevented the payment of the draft, and the assets of the bank in the hands of the drawee were actually increased to the amount of the draft by frustrating its payment. (*Tire and Rubber Co. v. Bank,* 109 Kan. 772, 204 Pac. 992; 21 A. L. R. 677.) But we have no such case here. No officer or employee of the defendant bank who participated in the clearing-house settlements of September 13 or 14 or in the issuance of the drafts pursuant thereto had notice or knowledge of the bank's insolvent condition or of the imminence of its being closed for insolvency. There was no evidence that any person connected with the defendant bank had any intention to defraud either of the plaintiff banks in giving them Kansas City drafts in lieu of cash to settle the balances due on those dates. No ruse or intentional deception was practiced on plaintiffs. Plaintiffs did not ask or expect to receive cash in settling their daily accounts. The issuing of the drafts was in accordance with the regular custom of the banks concerned in their daily settlement with each other. In 7 C. J. 751 the pertinent rule dealing with the rights of a holder of a bank draft which is dishonored because of the bank's insolvency is thus stated:

"One who holds a check or draft of a bank which becomes insolvent before such check or draft is paid is not entitled to any preference over other creditors; nor is the holder of a check drawn on an insolvent bank entitled to any preference. But one who purchased drafts from a bank when it was insolvent and [its officials] had no reason to expect that the drafts would be honored has been held entitled to a preference."

Here, however, it is argued for appellees that the president of the defendant bank must have known of its hopelessly insolvent condition at the time the drafts were issued. The trial court's finding

was to the contrary, and it is difficult to say that the court's finding was wholly without support in the evidence and agreed facts. But even so, the president of the bank took no part in the settlement of the day's business on September 14 nor in issuing the drafts in favor of plaintiffs.  He was absent on the bank's business that day; he could not anticipate that that particular day's business would require his bank to issue drafts in favor of his competitors. For aught he could foresee, the balances for September 14 might have had to be settled by drafts issued by plaintiffs in favor of the defendant bank.  We can discern no plausible theory upon which preferences can be declared in favor of these plaintiffs, nor are we able to discover any feature in these cases which would distinguish them from these which have recently had the attention of this court: *State Bank v. State Bank,* 114 Kan. 463, and citations, 218 Pac. 1000; *El Dorado Nat'l Bank v. Butler County State Bank,* 120 Kan. 109, and citations, 242 Pac. 475; *Guymon-Petro Mercantile Co. v. Farmers State Bank,* 120 Kan. 233, and citations, 243 Pac. 321.   Certain it is that these just cited are in accord with our earlier case of *Clark v. Bank,* 72 Kan. 1, 82 Pac. 582; and a painstaking perusal of *Tire & Rubber Co. v. Bank,* 109 Kan. 772, 204 Pac. 992, and *Secrest v. Ladd, Receiver,* 112 Kan. 23, 209 Pac. 824, will disclose fundamental differences between them and those now under discussion.

This conclusion necessarily disposes of the cross appeal in case No. 26,620, and the judgment thereon is affirmed.  In other respects the judgments of the district court must be reversed with instructions to deny plaintiffs' claims for preferences against the assets of the insolvent bank and that plaintiffs' claims involved in these actions be allowed and adjudged to be common claims as conceded by defendants on the joinder of issues in the trial court.

It is so ordered.